[No. 35319. Department One. October 6, 1960.]

JOHNSON SERVICE COMPANY et al., *Respondents*, v. LEO ROUSH et al., *Defendants*, AMERICAN SURETY COMPANY OF NEW YORK et al., *Appellants*.[1]

[1]Reported ·in 355 P. (2d) 815.

*Lewis L. Stedman* and *Clifford O. Moe,* for appellant American Surety Company.

*Charles K. Rice, Lee A. Jackson, A. F. Prescott, Carolyn R. Just, Dale M. Green,* and *Robert L. Fraser,* for appellant United States.

*The Attorney General* and *James A. Furber, Assistant,* for respondent State of Washington.

*Gibson & Palmer,* for respondent Westover and Hope.

*Ries & Kenison,* for respondent Moses Lake Consolidated School District.

DONWORTH, J.—This case involves the priority of payments from a fund of $16,118.54, which constitutes the unpaid balance on the contract price under a construction contract. The adverse claimants are the federal government, the Washington State Tax Commission, the American Surety Company of New York, Moses Lake Consolidated School District No. 161, and the contracting firm of Westover and Hope.

The case comes to us upon a short record. The facts are stipulated and may be summarized as follows:

On or about February 3, 1954, Moses Lake Consolidated School District No. 161 (hereinafter referred to as the school district) contracted with the Roush Plumbing and Heating Company (hereinafter referred to as the taxpayer) to do certain mechanical work on an addition to the Knoll's Elementary School building for a contract price of $66,697.62.

As required by RCW 39.08.010, the taxpayer executed a performance bond to insure the performance of its contract with the school district. Under the performance bond, the American Surety Company of New York (hereinafter referred to as the surety) was the obligor, and the school district, the obligee.

Under the terms of the contract, the taxpayer was to complete the work by October 17, 1954. The contract contained a provision whereby the taxpayer was to pay the school district, as liquidated damages, $100 a day for each day beyond the specified completion date that the contract remained uncompleted. The taxpayer did not complete the work under his contract until December 10, 1954, fifty-four days after the specified completion date.

Upon completion of the contract, there remained in the hands of the school district the sum of $16,118.54. Of this amount, $10,004.63 represented fifteen per cent of the total contract price required by RCW 60.28.010 to be retained by the school district to satisfy any unpaid claims of laborers and materialmen, and to satisfy any taxes incurred by the taxpayer under RCW Title 82, which may be due the state of Washington.

Various unpaid laborers and materialmen, who had furnished labor and materials to the taxpayer with respect to the principal contract, filed notices of lien claims with the school district. The surety paid the claims of those laborers and materialmen who, in its opinion, had complied with the statutes pertaining to filing notice of intent to claim a lien. (RCW 39.08.030 to 39.08.060.) The surety received assignments of these claims as of the date of their payment. Altogether, the claims paid by the surety, including attorneys' fees, interest and costs, amounted to $15,002.42.

The firm of Westover and Hope furnished labor and materials in the sum of $743.03 to the taxpayer in connection with the contract. However, the surety refused to pay this claim on the ground that the provisions of RCW 39.08.030, relating to the giving of notice, had not been complied with.

By virtue of its performance of the contract, the taxpayer incurred a liability to the State Tax Commission for taxes imposed by RCW Title 82. The state of Washington and the surety stipulated that the amount of taxes due and owing was $2,223.25.

Also, in connection with the performance of the contract, the taxpayer became indebted to the United States for

federal withholding, social security, and unemployment taxes in the total amount of $9,036.93. These taxes were assessed, and notices of liens were filed with the county auditor pursuant to RCW 60.68.010. After receiving notice and demand for payment, the taxpayer made partial payments totaling $1,834.81, thereby reducing its liability to the United States to $7,202.12.

This action originated when the Johnson Service Company, a materialman, brought suit against the taxpayer and the surety to recover for labor performed and material furnished under the principal contract. Various other materialmen claimants, the state of Washington, and the United States were joined as party defendants and filed answers and cross-complaints. Thereafter, the surety paid off the claims of the Johnson Service Company and the various other lien claimants (with the exception of Westover and Hope) and was substituted as a party in their stead.

Following a pretrial conference on April 29, 1957, the matter came on for trial on September 22, 1958, before the court sitting without a jury. On January 2, 1959, the trial court filed a memorandum opinion. Findings of fact, conclusions of law, and judgment were filed on March 20, 1959.

In arriving at its judgment, the trial court divided the $16,118.54 into two funds. The first fund of $10,004.63 constituted the fifteen per cent retained by the school district, under RCW 60.28.010, for the benefit of laborers and materialmen and the State Tax Commission. The second fund consisted of the excess of $6,113.91.

In distributing the retained percentage fund of $10,004.63, the trial court awarded $2,223.25 to the State Tax Commission; $993.03 to Westover and Hope ($743.03 for labor and materials plus $250 attorneys' fees); and the remainder of $6,788.35 to the surety in partial satisfaction of its claim for $15,002.42.

As to the excess fund of $6,113.91, the trial court held that the school district was entitled to $5,400 as liquidated damages under the construction contract for the taxpayer's

failure to complete the work within the specified time. The difference of $713.91 ($6,113.91 less $5,400) was awarded to the United States in partial satisfaction of its federal tax liens.

After the above distribution, the taxpayer remained indebted to the United States in the sum of $6,448.21 and to the surety in the sum of $8,214.07, for which amounts the trial court entered judgment against the taxpayer.

Following the entry of judgment, the United States filed a motion for a new trial, which was denied.

The United States and the surety have appealed.

The United States assigns eight errors, most of which are merely cumulative. In essence, it is claimed that the trial court erred in holding that the United States had no right to any of the money which comprised the fifteen per cent retained percentage fund.

The United States contends that its tax liens are valid against the retained percentage fund and are entitled to priority of payment over the claims therein of Westover and Hope, the surety, and the State Tax Commission.

█ Whatever interest the United States might have herein is predicated upon section 6321 of the Internal Revenue Code of 1954, which reads as follows:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all *property* and *rights to property,* whether real or personal, belonging to such person." (Italics ours.)

█ Thus, the initial question to be resolved is not one of *priority*, but one of *property*. It must first be determined to what extent, if any, the taxpayer had "property" or "rights to property" in the retained percentage fund to which the federal tax liens could attach. This is a matter to be ascertained under state law. As the United States Supreme Court so recently stated in *Aquilino v. United States*, 363 U. S. 509, 4 L. Ed. (2d) 1365, 80 S. Ct. 1277:

"The threshold question in this case, as in all cases where

the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that 'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property . . . sought to be reached by the statute.' [§ 6321, *supra*] *Morgan v. Commissioner*, 309 U. S. 78, 82. Thus, as we held only two Terms ago, Section 3670 [§ 6321 of the 1954 Code] 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law. . . .' *United States v. Bess*, 357 U. S. 51, 55. . . ."

See, also, *United States v. Durham Lbr. Co.*, 363 U. S. 522, 4 L. Ed. (2d) 1371, 80 S. Ct. 1282.

As previously stated, the money comprising the retained percentage fund was withheld by the school district pursuant to RCW 60.28.010, which provides:

"Contracts for public improvements or work by the state, or any county, city, town, district, board, or other public body, shall provide, and there shall be reserved from the moneys earned by the contractor on estimates during the progress of the improvement or work, a sum equal to fifteen percent of such estimates, said sum to be retained by the state, county, city, town, district, board, or other public body, as a trust fund for the protection and payment of any person or persons, mechanic, subcontractor or materialman who shall perform any labor upon such contract or the doing of said work, and all persons who shall supply such person or persons or subcontractors with provisions and supplies for the carrying on of such work, and the state with respect to taxes imposed pursuant to Title 82 which may be due from such contractor. Said fund shall be retained for a period of thirty days following the final acceptance of said improvement or work as completed, and every person performing labor or furnishing supplies toward the completion of said improvement or work shall have a lien upon said fund so reserved, provided such notice of the lien of such claimant shall be given in the manner and within the time provided in RCW 39.08.030 through 39.08.060 as now existing and in accordance with any amendments that may hereafter be made thereto: . . . ."

RCW 60.28.020 provides:

"After the expiration of the thirty day period, and after receipt of the tax commission's certificate, the reserve *in excess* of a sum sufficient to discharge the taxes certified as due or to become due by the tax commission, and the claims of materialmen and laborers who have filed their claims, together with a sum sufficient to defray the cost of foreclosing the liens of such claims, and to pay attorneys' fees, shall be paid to the contractor." (Italics ours.)

The basis for the trial court's ruling that the United States had no claim in the retained percentage fund is clearly stated in its memorandum opinion:

"It appears to the Court that as to the retained percentage ($10,004.63) the right of the United States can rise no higher than the property rights of Leo Roush [the taxpayer] therein. This retained percentage is a 'trust fund' for unpaid laborers and materialmen and in this case he would have no property rights therein whatever. Therefore, there is no basis for a lien of the United States against this fund. To obtain a lien against this fund the United States would have to show some right of Leo Roush to the fund, this it has not done. The mere assessment of the Federal Tax does not create a lien for the United States on or against property in which the person who owes the tax has no property right. . . ."

We concur. In many respects, the *Durham* case, *supra*, is directly in point here. In that case, the taxpayers were general contractors doing business at Durham, North Carolina, and had undertaken the construction of certain buildings. Upon completion of the construction work, there was due from the owners $5,250 under the construction contract. However, payment to the taxpayers was delayed as the owners disputed the amount due under the contract. Various unpaid subcontractors gave notice to the owners of their respective claims. Another claimant was the United States, which was asserting a lien for federal taxes under § 6321, *supra*, of the Internal Revenue Code of 1954. The taxpayers were subsequently adjudicated bankrupts. To absolve themselves from liability, the owners paid the $5,250 to the trustee in bankruptcy.

The referee in bankruptcy, attempting to resolve the competing claims of the subcontractors and the United States, decided that the rights of the federal government under its tax lien were superior to those of the subcontractors. The District Court for the Middle District of North Carolina took the opposite position, and held that the rights of the subcontractors were superior to the federal government's tax lien. The decision was affirmed by the Court of Appeals for the Fourth Circuit, in 257 F. (2d) 570. On certiorari, the United States Supreme Court affirmed the Court of Appeals as follows:

"In affirming the judgment of the District Court, the Court of Appeals stated that the nature and extent of the general contractors' property rights, to which the tax lien attached, must be ascertained under state law. The court then undertook an extensive analysis of the relevant North Carolina statutes and cases. It found that the North Carolina law provides as follows: Subcontractors who have not been paid by the general contractor have a direct, independent cause of action against the owner to the extent of any amount due under the general construction contract, and any money owed by the owner under the construction contract must first be used to satisfy subcontractors' claims of which the owner has notice. Moreover, to insure that the owner will receive notice of outstanding subcontractors' claims, the North Carolina statute, N. C. Gen. Stat., 1950, § 44-8, requires the general contractor, before receiving any payment, to furnish the owner with a statement of all sums due subcontractors, and if the general contractor fails to supply the required statement, he is guilty of a misdemeanor. N. C. Gen. Stat., 1950, § 44-12. Finally, the court found further evidence of the direct and independent nature of the subcontractors' claims against the owner in N. C. Gen. Stat., 1950, § 44-9, which provides that should the owner pay the general contractor after receiving notice of a subcontractor's claim, he will nevertheless be liable to the subcontractor to the extent of the amount which was due under the construction contract at the time notice was received.

"Based upon these considerations, the Court of Appeals held that, under North Carolina law, the general contractor did not have a property interest in the face amount, as such, of the general construction contract. Specifically, the court

said that *'except to the extent the claim of the general contractor exceeds the aggregate of the claims of the subcontractors, the general contractor has no right which is subject to seizure under the tax lien.' Id.,* at 574. Therefore, concluded the court, since under North Carolina law the taxpayers possessed merely a right to the residue of the fund, and since the Government's tax lien attached to the property interests of the taxpayers as defined by state law, the Government can recover only 'so much of the construction price as will remain unpaid after the owners have deducted a sum sufficient to pay the subcontractors.' . . .

" . . . Since the Court of Appeals is much closer to North Carolina law than we are, and since we cannot say that the court's characterization of the taxpayers' property interests under that law is clearly erroneous or unreasonable, the judgment is *Affirmed*." (Italics ours.)

■ Likewise, in the instant case RCW 60.28.010-.020, *supra*, make it clear that, except to the extent that the claim of the taxpayer exceeds the aggregate of the claims of the subcontractors and the State Tax Commission, the taxpayer has no right which is subject to seizure. Here, there was no "reserve in excess of a sum sufficient to discharge the taxes . . . due . . . and the claims of materialmen and laborers." Thus, as to the retained percentage fund, there was nothing to which the federal tax liens could attach. This being so, we do not reach any question of "priority" of claims with respect to the retained percentage fund.

The foregoing disposes of all the assignments of error presented by the United States, except the following:

"That the Court erred in deducting the damages allowed the Grant County School District No. 161 from the full balance of the contract price instead of deducting such damages from the computed 15% retained percentage."

■ We find no contention or argument in the United States' brief in support of such error. It is well settled that an assignment of error which is not supported in the brief by argument will not be considered. *State v. Williams*, 49 Wn. (2d) 354, 301 P. (2d) 769 (1956), and cases cited therein.

The surety assigns error to the trial court's judgment in the following particulars: (1) In allowing any recovery to Westover and Hope, (2) in allowing *any* recovery from the fund in the hands of the school district to the United States, (3) in allowing the school district $5,400 in damages for delay in performance.

We shall discuss the assignments seriatim.

■ The surety contends that, since Westover and Hope did not substantially comply with the form of notice required by RCW 39.08.030, their lien must fail. *Fidelity & Deposit Co. of Maryland v. Conway*, 14 Wn. (2d) 551, 128 P. (2d) 764 (1942), is relied upon.

In ruling upon this matter, the trial court stated in its memorandum opinion:

"It appears to the Court that while Westover and Hope did not follow the statute strictly in making their claim against the Bonding Company and the retained percentage, they did inform everyone concerned of their work for Roush Plumbing and Heating on this job and of their claim for the same. They informed the architect, the School District, the Attorneys for the School District, the American Surety Company and Roush Plumbing and Heating. In the letter to The American Surety Company the Company is advised of the unsatisfied claim of Westover and Hope. In answer the Company acknowledges receipt of the letter 'in connection with the claim of Westover and Hope' for the amount of $743.03 and states 'I would prefer to withhold any discussion regarding the merits of your clients claim until a later date'.

"The Bonding Company now takes the position that Westover and Hope are not entitled to a judgment against the Company and the retained percentage because the statute was not strictly followed in giving notice of their claim and it cites the case of Fidelity and Deposit Company of Maryland vs. Conway 14 Wn (2) 551 in support of its position. That case is very much in point. However the facts do differ. In that case the attorney for the Bonding Company suggested that the claimant follow the statutory procedure. In the present case the Bonding Company treated it as a claim received and asked to withhold discussion regarding the merits of the claim until a later date. In other words the Bonding Company had received the claim and wanted to put off the discussion of the merits of the

claim until later. After the Claimant has given the Company time within which to discuss the merits of the claim the Company cannot now say we want to talk about the form of the claim rather than the merits of the claim."

The trial court's conclusion of law No. 3 reads, in part:

". . . that the American Surety Co. of New York is *estopped* from questioning the *form* of the claim made by the Defendant, Westover and Hope." (Italics ours.)

We agree. As the trial court observed, there is a distinction between the *Conway* case, *supra*, and the case at bar, in that the surety in *Conway* expressly requested the claimant to follow the statutory procedure in filing his claim; whereas, in the instant case, the surety acknowledged to Westover and Hope that their "claim" had been received but that they preferred to postpone any discussion as to its merits until a later date. Having once recognized the claim *as such*, we think the surety in effect waived its right to insist that the statute be substantially complied with as to the *form* of the claim and, furthermore, is estopped from doing so.

■ With respect to assignment of error No. 2, the surety contends that the trial court erred in awarding the United States $713.01 from the excess fund of $6,113.91.

All of the parties hereto have stipulated that the construction work was finally accepted by the architect and the school district on June 6, 1955, as having been substantially completed on December 10, 1954.

Bearing in mind that the $713.01 constitutes no part of the retained percentage fund, such amount represents money earned by the taxpayer under the construction contract. Upon acceptance by the school district of the taxpayer's work as being in substantial completion of the contract, this money became the "property" of the taxpayer. The question thus becomes one of *priority* between the competing claims of the surety and the United States.

The taxpayer's bond application to the surety contains the following statement:

". . . the Indemnitor further agrees in the event of any breach or default on his part in any of the provisions

of the contract and/or bond that the said Company shall be subrogated to all the rights and properties of the Indemnitor in such contract, including deferred, and reserved payments, . . ."

Section 6322 of the Internal Revenue Code of 1954, provides:

"Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed is satisfied or becomes unenforceable by reason of lapse of time."

The federal taxes were assessed against the taxpayer on March 9 and 23, 1955, June 15 and 30, 1955, and August 21, 1955. Under § 6322, *supra*, the federal liens were perfected on those dates. The earliest date on which the surety paid any claimant for labor and material furnished the taxpayer was November 7, 1955 (Johnson Service Co., $4,166.00; American Air Filter Co., $2,268.75). Thus, under the terms of the bond application quoted above, the surety became subrogated to the rights and properties of the taxpayer as of November 7, 1955, which was after the federal tax liens had already attached to the $713.01. Therefore, the federal tax liens would take precedence over the claim of the surety, as the surety could not acquire by subrogation any greater right to the property than the taxpayer had therein.

However, the surety strongly urges that it is not merely subrogated to the rights of the taxpayer, but it is also subrogated to all the rights of the owner (in this case the school district), to see that all laborers and materialmen are paid from funds still under the school district's control. In support of its contention, the surety quotes from *Levinson v. Linderman*, 51 Wn. (2d) 855, 322 P. (2d) 863 (1958), as follows:

" 'It is a well settled doctrine that, where the sureties on a contractor's bond complete the contract on his *abandonment* of it, they stand in the position of the owner of the property to which the contract relates, to the extent at least that they are entitled to sufficient of the money to be paid on the contract to save themselves from loss on their contract of suretyship, and the contractor cannot make a

valid contract, by assignment or otherwise, the effect of which is to deprive the sureties of this right.' " (Italics ours.)

The rule of the *Levinson* case, *supra*, applies where the contractor has *abandoned* the contract or is declared to be in *default* and it is necessary for the surety to step in and complete the construction under the contract. In such a case, the money remaining in the hands of the owner has been *earned* by the surety by virtue of its completion of the construction work. Such was the case in *Levinson.*

In the instant case, the taxpayer did not abandon the contract. It was not necessary for the surety to intervene and complete the construction work. The school district accepted the work as being in substantial completion of the contract. Under the terms of the contract, the $713.01 then became due and payable to the taxpayer. In the *Levinson* case, *supra*, it is further stated:

"This conclusion is reinforced by *Colusa-Glenn Production Credit Ass'n v. Phoenix Ins. Co.*, 145 F. Supp. 844, 847 (1956), in which it was held that the surety's right to subrogation was even superior to the Federal tax lien because the funds belong not to the contractor, but to the surety by right of subrogation."

An examination of the *Colusa* case, *supra*, reveals that, there again, the contractor abandoned the work under the contract, and it was necessary for the surety to step in and complete the work. Under such conditions, it was found that the money remaining in the hands of the owner was not money which had been earned by the contractor but, rather, by the completing surety.

In the instant case, the contractor was in default only with respect to his failure to pay certain laborers and materialmen. When the surety satisfied their claims, it became subrogated to their rights. However, its rights can rise no higher than theirs. *North Pacific Bank v. Pierce County*, 24 Wn. (2d) 843, 167 P. (2d) 454, 164 A. L. R. 602 (1946), and cases cited therein.

■ ■ Whether the liens of the laborers and materialmen or the federal tax liens take precedence is a matter to be determined under federal law. *Aquilino v. United States,*

*supra.* As we stated in *Weitz v. Electrovation, Inc.*, 48 Wn. (2d) 604, 295 P. (2d) 728 (1956):

"In order for a general lien to achieve priority over a Federal internal revenue lien, it must have become specific and perfected, within the meaning given to those terms by the Federal courts, prior to the date the assessment rolls are received by the collector. *Fleming v. Brownfield*, 47 Wn. (2d) 857, 290 P. (2d) 993. As we pointed out in that case, since 1950, the Federal courts have consistently held that, in order for a lien to become 'specific and perfected,' the claim must be reduced to judgment."

Thus, the liens of the laborers and materialmen did not become perfected or choate here until March 20, 1959, the date of the trial court's judgment, from which this appeal was taken. Since the liens of the laborers and materialmen did not become perfected prior to the effective date of the federal liens, the claim of the United States must be given priority.

Assignment of error No. 3 reads:

"In permitting the School District to retain the sum of $5,400.00 on account of delay in performance."

A party appealing on a short record can base error only on points included in his statement of points. *Dolby v. Fisher*, 1 Wn. (2d) 181, 95 P. (2d) 369 (1939).

Assignment of error No. 3 is predicated upon the third paragraph of the surety's statement of points, which reads:

"The Court erred in not holding that the 15% retained percentage required to be withheld from the contract price constituted a trust fund for the benefit of the laborers and materialmen, . . ."

In our opinion, this statement is wholly insufficient to serve as a basis for assignment of error No. 3.

The judgment of the trial court is affirmed in all respects.

MALLERY, FINLEY, OTT, and HUNTER, JJ., concur.

----

December 16, 1960. Petition for rehearing denied.